15-985-cr
*United States v. Rowland*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: March 18, 2016    Decided:  June 17, 2016)

Docket No. 15-985

UNITED STATES OF AMERICA,

*Appellee,*

−v.−

JOHN G. ROWLAND,

*Defendant-Appellant.*

B e f o r e :

WINTER, CHIN, and CARNEY, *Circuit Judges.*

Defendant-Appellant John G. Rowland, the former governor of Connecticut, came under scrutiny in 2012 for his efforts to obtain paid political consulting work on behalf of two Republican Congressional candidates in the 2010 and 2012 election cycles. One of those candidates, Lisa Wilson-Foley, allegedly arranged with Rowland to pay him through her husband's nursing home company, Apple Rehab, in order to avoid reporting the payments to the Federal Election Commission.  After a trial, a jury convicted Rowland on seven counts of violating campaign-finance laws and falsifying records.  The United States District Court for the District of Connecticut (Janet Bond

Arterton, *J.*) sentenced Rowland principally to 30 months' imprisonment. Rowland now challenges both his conviction and his sentence.

We conclude that Rowland was properly convicted under 18 U.S.C. § 1519 because he created or participated in the creation of documents that misrepresented—or "falsified"—his relationships with the Congressional candidates, Wilson-Foley and Mark Greenberg, and he did so with the intent to impede a possible future federal investigation. We reject Rowland's assertion that principles of contract law prevent us from concluding that documents styled as contracts are "falsified" within the meaning of the statute. We also determine that the government adequately disclosed Wilson-Foley's statements to Rowland, and that even if it did not, he would not be able to show that he was prejudiced by the deficiency. Finally, we reject his challenges to the District Court's evidentiary rulings, jury instructions, and Sentencing Guidelines calculation.

AFFIRMED.

————————

LIAM B. BRENNAN, Assistant United States Attorney (Marc H. Silverman, Assistant United States Attorney, *on the brief*), *for* Deirdre M. Daly, United States Attorney for the District of Connecticut, New Haven, Connecticut, *for Appellee*.

ANDREW L. FISH (R. James DeRose III, *on the brief*), Locke Lord LLP, New York, New York, *for Defendant-Appellant*.

————————

SUSAN L. CARNEY, *Circuit Judge*:

Defendant-Appellant John G. Rowland, the former governor of Connecticut, came under scrutiny in 2012 for his efforts to obtain paid political consulting work on behalf of two Republican Congressional candidates in the 2010 and 2012 election cycles.

2

One of those candidates, Lisa Wilson-Foley, allegedly arranged with Rowland to pay him through her husband's company, Apple Rehab, to avoid reporting the payments to the Federal Election Commission ("FEC").  After a trial, a jury convicted Rowland on seven counts of violating campaign-finance laws and falsifying records.  The United States District Court for the District of Connecticut (Janet Bond Arterton, *J.*) sentenced Rowland principally to 30 months' imprisonment.

Rowland now appeals his conviction and sentence.  His primary argument on appeal is that 18 U.S.C. § 1519, which prohibits "knowingly . . . falsif[ying] . . . any record, [or] document," does not apply to his conduct: namely, preparing contracts that purported to establish business consulting relationships with political candidates or their businesses, when in fact the parties were negotiating for him to provide political consulting services to the candidates' campaigns.  He also asserts a *Brady* violation based on the government's alleged failure to disclose statements made by Lisa Wilson-Foley in an interview with investigators.  Finally, he challenges the District Court's evidentiary rulings, jury instructions, and application of the Sentencing Guidelines.

For the reasons set forth below, we AFFIRM the judgment of the District Court. We conclude that the broad language of § 1519 encompasses the creation of documents—like the contracts at issue here—that misrepresent the true nature of the parties' negotiations, when the documents are created in order to frustrate a possible

future government investigation. We reject Rowland's assertion that principles of contract law prevent us from concluding that documents styled as contracts are "falsified" within the meaning of the statute. We also determine that the government adequately disclosed Wilson-Foley's statements to Rowland, and that even if it did not, he is not able to show that he was prejudiced by the deficiency. Finally, we reject his challenges to the District Court's other rulings at trial and at sentencing.

## BACKGROUND[1]

John G. Rowland, the former governor of Connecticut, resigned that post in 2004 amid a corruption scandal, and later pled guilty to a federal charge of conspiracy to commit honest-services and tax fraud. After serving his sentence, Rowland sought to use his political experience by doing political consulting work on behalf of Republican candidates seeking federal office in Connecticut. The instant charges stem from his efforts to secure employment on two campaigns: the 2010 campaign of Mark Greenberg and the 2012 campaign of Lisa Wilson-Foley.

Rowland and Greenberg first met in the summer of 2009, when Greenberg told Rowland he was considering a run for the United States Senate. Rowland suggested that Greenberg "think about Congress" and repeatedly offered to serve as a paid

---

[1] The following recitation of facts is taken from the trial record, viewing the evidence, as we must for purposes of this appeal, "in the light most favorable to the government, with all reasonable inferences drawn in its favor." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam).

4

consultant for the campaign. Gov't App. at 23 (Tr. 91:24). Rowland told Greenberg he did not want to be paid by the campaign—which would have had to report his employment—but instead wanted to be paid by Greenberg's business or charitable interests. Later that year, Rowland prepared and gave to Greenberg a draft contract, according to which he proposed to provide "consulting services" for Greenberg's businesses and his nonprofit, the Simon Foundation. Under the proposal, Rowland would be paid $35,000 per month for 14 months and $25,000 per month for the year thereafter. Greenberg never hired Rowland to work on his campaign or for any other entity, and "ripped . . . up" the draft contract after his meeting with Rowland. App. at 118 (Tr. 207:16).

Rowland met Wilson-Foley two years later, in September 2011. Rowland contacted Wilson-Foley—who by then had declared her Congressional candidacy—and her husband, Brian Foley, with "an idea to run by [them]": namely, that he would take on a paid role in her campaign. Gov't App. at 716. Wilson-Foley and her husband believed that Rowland could be helpful to the campaign, but were concerned that (in Foley's words) "having a former governor who was a convicted felon connected to the campaign as an advisor" could potentially jeopardize her candidacy. Gov't App. at 199 (Tr. 796:17-19). Several of Wilson-Foley's staffers and friends urged her to remain at a distance from Rowland.

Foley, who headed Apple Rehab ("Apple"), a nursing home company, made a suggestion: Apple would hire Rowland as a consultant, but in reality Rowland would work primarily for Wilson-Foley's campaign. Because Rowland would be paid by Apple rather than by the campaign, they believed that by this stratagem they could avoid the requirement that his employment be publicly reported to FEC.[2] Foley and Rowland ultimately agreed that Rowland would receive $5,000 per month, to be paid by Apple's attorney, Christian Shelton, in order to avoid direct "connections" between Rowland and the Foleys. Gov't App. at 724. Wilson-Foley explained to her campaign manager that Rowland would be paid by Apple because "that way they wouldn't have to report it to the FEC." Gov't App. at 310 (Tr. 1240:23-24).

After this agreement was finalized, Rowland worked on Wilson-Foley's campaign almost daily, vetted press releases, used a campaign e-mail address, and received access to the campaign calendar. He attended staff meetings and was involved with communications strategy and fund-raising. Rowland also did some work for Apple during this period: He met with Apple staff on eight to ten occasions, conducted research at Apple's request about the nursing home industry in Connecticut, helped Apple hire a new lobbyist, and advised Apple on union issues, among other tasks. The

[2] The FEC requires House candidates to disclose and itemize disbursements to an individual from official campaign funds when the individual receives disbursements totaling in excess of $200 per calendar year. *See* 11 C.F.R. § 104.3(b)(3)(i). The FEC also requires candidates to disclose their own in-kind contributions to a campaign. *See* 11 C.F.R. §§ 100.52(d)(1), 110.10.

record indicates, however, that Rowland's campaign involvement may have substantially exceeded the amount of work he performed on behalf of Apple. For example, during the relevant period, Rowland participated in 787 e-mail exchanges about the campaign, but only 63 e-mail exchanges regarding Apple, and 23 e-mail exchanges about both Apple and the campaign.

Rowland's relationship with the Wilson-Foley campaign became public in April 2012. Although Wilson-Foley, Foley, and Rowland denied anything improper about the arrangement, Rowland's ties to the campaign and Apple ended shortly thereafter. After the disclosures, the federal government began investigating Rowland's work for the campaign.

In June 2014, a grand jury returned an indictment charging Rowland with (1) falsification of records in a federal investigation in violation of 18 U.S.C. § 1519, based on the Greenberg contract; (2) conspiracy to commit various offenses in violation of 18 U.S.C. § 371, based on an alleged unlawful conspiracy with Wilson-Foley and Foley; (3) falsification of records in a federal investigation in violation of 18 U.S.C. §§ 1519 and 2, based on the Foley contract; (4) two counts of causing the submission of false statements to the FEC in violation of 18 U.S.C. §§ 1001(a)(2) and 2, based on the omission of Rowland's payments from two FEC reports filed by the Wilson-Foley campaign; and (5) two counts of causing illegal campaign contributions in violation of 2

U.S.C. §§ 441a(a)(1)(A), 441a(f), and 437g(d)(1)(A)(ii) and 18 U.S.C. § 2, based on Foley's payments to Rowland for his campaign work in 2011 and 2012.

Following a jury trial, Rowland was convicted on all counts. The District Court denied Rowland's motion for a new trial on the basis of alleged *Brady* violations: namely, the government's alleged failure to disclose certain statements made by Wilson-Foley at an investigatory interview. Rowland was sentenced to 30 months' imprisonment and three years of supervised release. He now appeals both his conviction and sentence.

## DISCUSSION

Rowland's primary argument on appeal is that the evidence did not support his convictions under 18 U.S.C. § 1519 because the contract he offered to Greenberg and the contract he signed with the law office of Apple's lawyer, Christian Shelton, were not "falsified" within the meaning of the statute. He also argues that he is entitled to a new trial because the government improperly withheld *Brady* material from the defense. Finally, he raises a number of other issues relating to the District Court's evidentiary rulings, its jury instructions, and his sentence. We address these arguments in turn.

### I.    18 U.S.C. § 1519

We review Rowland's challenge to the sufficiency of the evidence *de novo*, viewing the evidence "in the light most favorable to the government, with all

8

reasonable inferences drawn in its favor." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam).

Rowland was convicted of two counts of violating 18 U.S.C. § 1519, an obstruction of justice statute that was passed in 2002 as part of the Sarbanes-Oxley Act. The statute prohibits

> knowingly alter[ing], destroy[ing], mutilat[ing], conceal[ing], cover[ing] up, falsif[ying], or mak[ing] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . or in relation to or contemplation of any such matter or case.

18 U.S.C. § 1519.  The government contended that Rowland "falsif[ied] . . . document[s]" when he (1) prepared the contract proposal that he presented to Greenberg in 2009, and (2) drafted the contract with Brian Foley, Apple, and Apple's lawyer, Christian Shelton, in 2011.

**A.  Meaning of "Falsify"**

Rowland first argues that the documents could not be "falsified" within the meaning of the statute because to "falsify" means only to tamper with a preexisting document, not to create a new document from whole cloth.

"Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000).  The plain meaning

9

"does not turn solely on dictionary definitions of [the statute's] component words," but is also determined by "the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 135 S.Ct. 1074, 1081-82 (2015) (plurality opinion) (internal quotation marks omitted). If the meaning is plain, the inquiry ends there. *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 423 (2d Cir. 2005). If we find the statutory provision ambiguous, however, "we then turn to canons of statutory construction for assistance in interpreting the statute. *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015). We resort to legislative history only if, after consulting canons of statutory instruction, the meaning remains ambiguous. *Daniel*, 428 F.3d at 423.

We begin with the text. Where, as here, there is no statutory definition of a term, we consider "the ordinary, common-sense meaning of the words." *Dauray*, 215 F.3d at 260.

Webster's Third New International Dictionary offers two relevant definitions of "falsify." The first is the definition offered by Rowland: "to make false by mutilation or addition : tamper with." *Falsify*, Webster's Third New International Dictionary, Unabridged (2002). But the second supports the government's position here: "to represent falsely : misrepresent, distort." *Id.*; *see also Falsify*, Oxford English Dictionary (2d ed. 1989) (defining "falsify" as "[t]o give a false account of; to misrepresent").

10

Dictionary definitions thus confirm that, in common usage, it is acceptable to say that someone "falsifies" a document when he creates a document that misrepresents the truth.[3]

We acknowledge that, as Rowland points out, the Supreme Court has cautioned against overreliance on dictionary definitions in interpreting this particular statute. *See Yates*, 135 S. Ct. at 1081-82. But the same interpretive clues that led the plurality in *Yates* to depart from the ordinary dictionary definition in that case counsel in favor of following the dictionary definition here.

First, § 1519's caption is "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy." In *Yates*, the plurality concluded that this caption pointed away from interpreting the statute's phrase "tangible object" to include a fish because the caption "conveys no suggestion that the section prohibits spoliation of any and all physical evidence, however remote from records." *Id.* at 1083. Rather, § 1519, the plurality observed, was intended to sweep in only "records, documents, or devices closely associated with them." *Id.* Here, unlike in *Yates*, interpreting "falsify"—in accordance with its dictionary definition—to include the creation of a document fits comfortably within the general purview of the statute suggested by the title.

---

[3] "Falsify" can also mean "to prove to be false" or "to prove unsound or untrue by experience," but neither party suggests that those meanings aid in our understanding of the statute. *See Falsify*, Webster's Third New International Dictionary, Unabridged (2002).

11

Second, Rowland's preferred definition of "falsify" would overlap with other verbs in the statute. *Cf. id.* at 1085 (rejecting government's interpretation because it would "render superfluous" another statutory provision). He argues that "falsify" prohibits only changes to existing documents. But the statute expressly prohibits "alter[ing] . . . any record, document, or tangible object" with the requisite intent. If we limited the reach of "falsify" as Rowland suggests, the word would add nothing to the statute's meaning. "It is well-settled that courts should avoid statutory interpretations that render provisions superfluous: 'It is our duty to give effect, if possible, to every clause and word of a statute.'" *State St. Bank & Tr. Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Rowland argues that the interpretive canon of *noscitur a sociis*—"a word is known by the company it keeps," *Yates*, 135 S. Ct. at 1085—also supports his position here. We rely on that principle "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)) (internal quotation marks omitted). In § 1519, "falsifies" appears in a list of other verbs—"alters, destroys, mutilates, conceals, covers up . . . or makes a false entry in"—that, Rowland argues, imply the preexistence of a document. Rowland plausibly argues that we should therefore interpret "falsify," too, to apply only to preexisting documents. But

12

when the plain meaning of "falsify" and other interpretive guideposts lead to the opposite conclusion, a lone canon of construction cannot cabin the meaning of "falsify" as Rowland urges.

To the extent any ambiguity remains, legislative history also supports the government's contention that creating a new document can violate § 1519:  "Section 1519 is meant to apply broadly to any acts to destroy *or fabricate* physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation."  S. Rep. No. 107-146, at 14 (2002) (emphasis added).

### B.  Falsity of Rowland Contracts

Having concluded that a defendant may violate § 1519 by creating a document that is false or that misrepresents the truth—that is, was "falsified"—we turn to the question whether the contracts at issue here were "falsified."

Rowland's primary support for his claim that the contracts at issue were not "falsified" lies in *United States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004).  In that case, the Eleventh Circuit interpreted a different statute that prohibited knowingly and willfully "mak[ing] or us[ing] any false writing or document" in any matter under federal jurisdiction.  *See* 18 U.S.C. § 1001(a)(3).  The defendant, the owner of a minority-

13

owned business, entered into subcontracts and equipment leases to make it appear that he was providing services to a government contractor. *Blankenship*, 382 F.3d at 1116-17. In fact, the services were provided by a different company, not owned by a minority, that sought to take advantage of the government's preference for contracts with minority-owned businesses. *Id.*

The court vacated the defendant's conviction, reasoning that the contracts between the defendant and the other company were not "false." *Id.* at 1132-36. The court began its analysis with the proposition that

> there are only two ways in which a contract can possibly be considered "false." First, a contract is false if a person forges or alters it. . . . The only other way in which a contract can be "false" is if it contains factual misrepresentations.

*Id.* at 1132. The court concluded that promises made in a contract are not "false," even if "neither party actually intended to carry through on their promises," because "[a] 'promise' contained in a contract is not a certification that the promisor will actually perform the specified acts, or presently intends to perform those acts." *Id.* at 1133. Instead, the court observed, a contract simply creates a legal relationship requiring *either* performance or payment of damages. *Id.* at 1134.

Although in some circumstances, we might agree with these observations, our approach diverges from that of the Eleventh Circuit. We think that importing principles of contract law into the interpretation of this criminal statute muddies the issues rather

14

than clarifies them. In our view, a written contract may be "falsified" for purposes of § 1519 if it misrepresents the true nature of the parties' agreement. Here, Rowland purported to memorialize the terms of his arrangements with Greenberg and the Foleys in written documents. In fact, according to the government's evidence at trial, those documents intentionally did *not* reflect the arrangement contemplated by the parties, which involved Rowland providing political consulting to Greenberg's and Wilson-Foley's campaigns. Instead, the documents reflected and were designed to reflect that he would be providing business consulting services to their corporate or charitable interests. If Rowland had written a memo to his file purporting to summarize the negotiations in this misleading way (that is, as business rather than political consulting), we think it plain that the memo would properly have been treated as a "falsified" document: that is, it would have misrepresented the conversations on which it was based. Where the government is able to prove the knowledge and intent elements of the statute as well, that Rowland presented his notes in the form of a contract does not avoid his criminal liability under § 1519.

Our decision in *United States v. Jespersen*, 65 F.3d 993 (2d Cir. 1995), is instructive. In that case, we easily concluded that a contract was "false" when it was inconsistent with the true relationship between the parties. Jespersen, an IRS employee, arranged for government contractors to do repairs on his home for free in exchange for

15

government contracts. *Id.* at 995-96. When the arrangement was uncovered, he created a backdated contract setting out a schedule of payments that he was supposed to make (but never did). *Id.* at 996. Jespersen was convicted under 18 U.S.C. § 1503 for, among other things, creating a false document in response to a grand jury subpoena. *Id.* at 997. We sustained his conviction on the basis that the contract was "not merely backdated, but fraudulently showed that [the contractor] had been paid for the work performed." *Id.* at 998. The fact that the document took the form of a contract erected no barrier to our determination that it was "false." *See also United States v. Mandanici*, 729 F.2d 914, 920 (2d Cir. 1984) (in prosecution under 18 U.S.C.§ 1001, finding a contract to be "false" when promisor had no intention of complying with promise when making it); *United States v. Shah*, 44 F.3d 285, 294 (5th Cir. 1995) (same).

Rowland's use of the draft Greenberg contract as part of his effort to derail the government's investigation in 2013 does not conclusively establish his liability, but it does illustrate how the document falsified—i.e., misrepresented—the true relationship between the parties. In a letter to prosecutors, Rowland's counsel wrote that the draft contract "evidence[s] my statement that the discussion concerning raising funds for the charity took place in October and early November. As you will see from the contract, there is no mention of the campaign, and indeed the contract continues for a period of time long after the campaign would have ended." App. at 576. In fact, Greenberg

16

testified at trial that the October and November negotiations principally concerned political consulting, not work for his charity. That the Greenberg document was styled as a contract does not preclude our conclusion that it was in fact "falsified" and therefore may be the basis for liability under § 1519.

The government's case that the Wilson-Foley contract was falsified is even stronger. First, the contract purported to establish a relationship between Rowland and Christian Shelton, Apple's attorney, when Rowland was in fact retained primarily to provide services to Lisa Wilson-Foley's political campaign. As Shelton wrote in an e-mail to Foley, the drafters put Shelton's name on the contract to avoid direct "connections" between Rowland and Wilson-Foley, because of "Rowland's background and the compliance issue that creates." Gov't App. at 724. During the drafting process, Rowland suggested that the contract should use his corporate identity—JGR Associates, LLC—rather than his name, for "more cover." App. at 562.[4] Express references to political consulting that were present in the original contract were deleted from the final version, supplying further circumstantial evidence that the parties intended to conceal the true nature of the agreement. *Compare* Gov't App. at 726 *with* App. at 549-53. The jury could readily conclude from this and other evidence that Rowland and his co-conspirators intentionally created a document that misrepresented their relationships

---

[4] In fact, the final contract was signed by Rowland personally, not as a representative of his LLC.

17

with the aim of concealing the truth from the FEC—and, not incidentally, the public.

Because the jury was entitled to conclude that both the Greenberg and Foley contracts were "falsified" in the sense that they were created to misrepresent the true relationships among the parties, Rowland's convictions under § 1519 stand, and we need not reach his argument that the "prejudicial spillover" from the § 1519 evidence requires us to overturn his convictions on all other counts.

## II. Alleged *Brady* Violation

Next, Rowland argues that he is entitled to a new trial because the government did not comply with its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, he contends that Lisa Wilson-Foley made exculpatory statements to the government during a March 10, 2014 interview that were omitted from the government's Memorandum of Interview (MOI) (which was provided to the defense) and not otherwise disclosed to Rowland. Had they been provided, the defense would likely have called her to testify about her statements, he asserts.

"*Brady* requires that the government disclose material evidence favorable to a criminal defendant." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012). "Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citations and internal

18

quotation marks omitted). The defendant need not show that the suppressed evidence would have resulted in an acquittal. *See Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (per curiam). Rather, a conviction must be reversed "upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal quotation marks omitted).

When reviewing alleged *Brady* violations, we "examine the record *de novo* to determine whether the information in question is material as a matter of law." *Mahaffy*, 693 F.3d at 127. The trial judge's assessment of the effect of nondisclosure is entitled to "great weight." *Id.*

Rowland bases his assertion of a *Brady* violation on (1) an affidavit by Craig Raabe, Wilson-Foley's attorney at the time of the interview with the government, and (2) an e-mail and notes written by another lawyer for the Foley family, Jessica Santos. According to Raabe, the MOI was incomplete in several respects, one of which Rowland identifies as a possible *Brady* violation. Raabe asserts that, despite pressure from the government during a break in the interview, Wilson-Foley refused to adopt the government's view that Rowland's work for Apple was a "sham" rather than a real job. App. at 446-47. Similarly, Santos's notes from the interview reflect that Wilson-Foley told the government that "it didn't ring out to her that Brian hired him as a sham; she didn't know this at the time." *Id.* at 513. Wilson-Foley's rejection of the government's

19

characterization of Rowland's job as a "sham" is not expressly recorded in the MOI.

After that interview, the government withdrew the joint plea agreement it had offered Foley and Wilson-Foley, under which Wilson-Foley would not have been prosecuted.

Rowland contends that Wilson-Foley's refusal to accept the government's characterization of his job as a "sham" tends to exculpate him by casting doubt on one of the government's key claims at trial: that when Rowland wrote "I get it" in an e-mail to Brian Foley, he was referring to the need to conceal their unlawful scheme to "employ" Rowland at Apple in exchange for services that he would actually provide to the campaign.[5]

But the Raabe affidavit and Santos notes are basically consistent with the MOI, which *was* disclosed to Rowland. According to the MOI, Wilson-Foley denied telling her campaign manager, Chris Covucci, that "it was good to have Mr. Rowland working

---

[5] The context for the "I get it" e-mail tends to confirm this understanding. On September 14, 2011, Wilson-Foley spoke with campaign staffer Chris Syrek about hiring Rowland. Syrek attempted to dissuade her from hiring Rowland because Rowland's employment would have to be reported on the campaign's quarterly FEC reports. In response to these concerns, Wilson-Foley told Syrek, "Well, maybe the campaign doesn't have to pay him." Gov't App. at 358 (Tr. 1432:1-2). In the 20 minutes following this conversation, Wilson-Foley had three phone calls with Rowland. Twenty-two minutes after his final call with Wilson-Foley, Rowland wrote the following message to Brian Foley:

> Brian,
> had a brief chat with Lisa, I get it, let's you and I meet , good time
> for you ? . . .

App. at 556.

20

for her husband and there was no concern with Mr. Rowland and the FEC filings." Gov't App. at 868. When she was asked about Rowland's e-mail reminding her that he was a "volunteer," she told the government that "it did not register to her that her husband, Brian, was paying Mr. Rowland." *Id.* In other words, the MOI records Wilson-Foley's denial of a connection between her campaign and Rowland's employment at Apple—exactly what Rowland now claims he did not know.

In addition, as the District Court found, Wilson-Foley's position that Rowland's employment with Apple was not a "sham" because she expected Rowland to do *some* work there was already known to the defense from other evidence. "[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (internal quotation marks omitted). Other evidence disclosed to Rowland—including a voicemail left for a prosecutor by Wilson-Foley's counsel shortly after this interview and statements she made to the press in 2012—evinced Wilson-Foley's stated belief that Rowland had a real job at Apple.

Rowland argues that he could have used Wilson-Foley's statements to impeach Brian Foley's testimony by emphasizing that Wilson-Foley had originally stuck to her story that Rowland was a volunteer for her campaign with a legitimate job at Apple.

But Rowland had abundant other evidence with which to impeach Brian Foley, and in fact Rowland's counsel did cross-examine him on the fact that the original "package" plea agreement had changed. Gov't. App. at 296. "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998).

Furthermore, Rowland has not shown that the Wilson-Foley statements put "the whole case in such a different light as to undermine confidence in the verdict." *Youngblood*, 547 U.S. at 870 (internal quotation marks omitted). We give "great weight" to the District Court's determination that, "[g]iven the strength of the other trial evidence against Defendant, . . . [he] has not met his burden of showing that there are grounds for a new trial." *United States v. Rowland*, No. 3:14cr79(JBA), 2015 WL 1190118, at *4 (D. Conn. Mar. 16, 2015). Here, there was considerable record evidence that Rowland, Foley, and Wilson-Foley conspired to conceal payments to Rowland made in exchange for services rendered to the Wilson-Foley campaign. For instance, Wilson-Foley's campaign manager testified that when he objected to the prospect of having Rowland on the official campaign payroll, she suggested that "maybe the campaign doesn't have to pay him." Gov't App. at 358 (Tr. 1432:1-2). Shortly after that

22

conversation, Rowland and Wilson-Foley had three telephone conversations, which were followed by Rowland's "I get it" e-mail to Brian Foley. In another e-mail, Rowland also described his work on the campaign as "'helping,'" with quotation marks suggesting that "help" was a euphemism for paid work. *Id.* at 722. Later in the campaign, Rowland reminded Wilson-Foley that he was "just a volunteer helping you and 'many other Republican candidates' in case anyone asks." *Id.* at 743. Finally, as the District Court noted, Rowland's role on the campaign expanded as soon as he agreed to the contract with Apple. He reported to campaign headquarters more frequently and his campaign-related e-mail correspondence also increased substantially. From the time the contract was signed in November 2011 until his campaign role was made public in April 2012, his work for Apple and his Apple-related correspondence remained minimal.

Against the backdrop of this powerful documentary and testimonial evidence of Rowland's guilt, neither Wilson-Foley's testimony—which, had it been favorable to Rowland, would have been subject to cross-examination by the government—nor the use of her interview statements to impeach Brian Foley would have changed the outcome of the trial. Accordingly, Rowland would not be entitled to a new trial even if he could persuade us—as he has not—that the government failed to meet its disclosure obligations.

## III. Evidentiary Rulings

Rowland also challenges three of the District Court's evidentiary rulings. This Court reviews rulings on the admissibility of trial evidence for abuse of discretion. *See United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence or rendered a decision that cannot be located within the range of permissible decisions." *Id.* (quoting *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008)). We will reverse only if an error affects a "substantial right," Fed. R. Evid. 103(a), meaning that the error "had a 'substantial and injurious effect or influence' on the jury's verdict," *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (quoting *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003)). "[W]here a court, upon review of the entire record, is sure that the evidentiary error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)) (alterations and other marks omitted).

Only one of Rowland's evidentiary challenges merits detailed discussion. At trial, Rowland sought to introduce e-mails and text messages that he wrote to Apple Chief Operating Officer Brian Bedard about matters related to the company. The District Court ruled that the writings were inadmissible hearsay because they would in effect allow Rowland to testify without making himself available for cross-examination.

24

An out-of-court statement is hearsay only if it is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Here, Rowland's purpose in offering the writings was not to establish the truth of his statements that, for instance, "the unions will push to nail non-union shops which of course flys [sic] in the face of saving $$," as Rowland wrote in one e-mail. App. at 578. Instead, Rowland sought to establish that he "was, in fact, working at Apple and taking the initiative to communicate with Bedard." Appellant's Br. at 54-55. The text messages and e-mails were therefore not hearsay and should have been admitted into evidence.

But no new trial is warranted, because this error was harmless. The defense was permitted to use the writings to refresh Bedard's recollection. Bedard then testified about the nature of the communications: namely, that he and Rowland communicated via text message about the status of the contract negotiations. The defense also introduced other evidence of Rowland's actual work for Apple, such as a report that he prepared at Apple's request about a state-sponsored study of nursing care in Connecticut. Under these circumstances, we are confident that the District Court's evidentiary error "did not influence the jury, or had but very slight effect," and therefore no new trial is warranted. *Garcia*, 413 F.3d at 210 (quoting *Kotteakos*, 328 U.S. at 764).

25

Rowland's remaining evidentiary challenges are meritless. It was not error for the District Court to allow Brian Foley to testify about the meaning of Rowland's use of expressions like "I get it," "this arrangement," and "cover," because those expressions were ambiguous without the context that Foley supplied. *See United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992). It was also proper for Sam Fischer and Mark Katz, Greenberg's campaign aides, to testify regarding what Greenberg told them about his meetings with Rowland, namely Rowland's proposal to work for the campaign while being paid by the Simon Foundation. What Greenberg told Fischer and Katz was not offered for the truth of the matters asserted, but instead to provide context for what Fischer and Katz knew during their subsequent meeting with Rowland. The statement was offered for its effect on the listeners, not its truth, and was therefore not hearsay. *See* Fed. R. Evid. 801(c). And even if we assume that the government may have, in its closing statement, treated Fischer and Katz's testimony as if it had been offered for the truth of the matter, those comments were (1) not objected to by Rowland at the time and (2) not unfairly prejudicial. *See United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) ("It is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." (internal quotation marks omitted)).

## IV. Jury Instructions

Rowland identifies a number of alleged errors in the District Court's jury instructions. We review those instructions *de novo*. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (per curiam). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* (quoting *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir. 2000)). A defendant challenging a jury instruction on appeal must demonstrate that he requested a charge that "accurately represented the law in every respect," that the charge delivered was erroneous, and that he was prejudiced by the error. *Id.* (internal quotation marks omitted).

"[A] criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible[] that evidence may be." *United States v. Durham*, 825 F.2d 716, 718-19 (2d Cir. 1987) (internal quotation marks omitted). The defendant bears the burden of establishing that an adequate evidentiary basis exists for the requested charge. *See United States v. Bok*, 156 F.3d 157, 163 (2d Cir. 1998). A district court's determination to the contrary is reviewed for abuse of discretion. *See United States v. Hurtado*, 47 F.3d 577, 585 (2d Cir. 1995).

27

Rowland argues that the District Court erred by failing to instruct the jury that "Mr. Rowland contends that he understood that any payments he received were for work performed for Apple." App. at 293. The District Court rejected this charge, reasoning that "[i]t's a proxy for [Rowland's] testimony, which the jury didn't hear." *Id.* at 318. Instead, the jury was instructed that Rowland "contends that . . . any payments he received were for work performed for Apple Healthcare, Inc." *Id.* at 401-02. Rowland now argues that this instruction did not properly represent his defense, which was that—no matter what Brian Foley's intentions were—Rowland *believed* that he was being compensated only for his work for Apple. But this aspect of his defense was adequately reflected in other parts of the jury instructions, in which the court informed the jury that "Mr. Rowland . . . contends that he acted in good faith at all times and not with the intent alleged in each count of the Indictment" and that "Mr. Rowland contends that any work performed by him for the Wilson-Foley campaign was in a volunteer capacity." *Id.* at 400-02. The District Court did not err in declining to use Rowland's preferred phrasing.

None of Rowland's other objections to the jury instructions has merit. His contention that the jury needed detailed instructions regarding the FEC rules that govern a candidate's contributions to his own campaign is unavailing. He argues that this testimony was needed to correct the "misimpression" from Greenberg's testimony

28

that Rowland's proposal to have Greenberg pay him directly was "wrong." Appellant's Br. at 52. But the jury was in fact told (albeit in other words) that Greenberg personally would have been permitted to pay Rowland for his services, as long as Greenberg reported those payments to the FEC. *See* Gov't App. at 666 (Tr. 2579:14-23). Rowland's final argument on jury instructions, that the court erred by instructing the jury that a defendant can falsify a document by knowingly omitting a material fact, is erroneous for the same reasons that Rowland's challenge to his § 1519 convictions fails.

## V. Guidelines Calculation

Finally, Rowland challenges the District Court's application of a six-level sentencing enhancement for "the value of the illegal transactions" pursuant to U.S.S.G. §§ 2C1.8 and 2B1.1. "This Court reviews a district court's application of the Guidelines *de novo*, while factual determinations underlying a district court's Guidelines calculation are reviewed for clear error." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015).

The applicable 2014 Sentencing Guidelines include a sentencing enhancement for campaign finance offenses that is based on the value of the illegal transactions, if the value exceeds $5,000. *See* U.S.S.G. § 2C1.8 (2014). The District Court calculated the value of the illegal transactions to be $35,000, the total amount of the payments Rowland received from Apple. That results in a six-level enhancement under the 2014 Guidelines. *See* U.S.S.G. § 2B1.1 (2014).

Rowland argues that the District Court erred in its calculation. He does not

dispute that he received $35,000 in payments from Apple. But he argues that the

amount he received should have been offset by $5,000, which he asserts to be the value

of the services he actually provided to the company.

The District Court rejected this argument on the ground that the value to Apple

of any services Rowland rendered was simply "a byproduct of the attempted cover-up

of the true nature of the campaign contributions." *United States v. Rowland*, No.

3:14cr79(JBA), 2015 WL 1275655, at *5 (D. Conn. Mar. 19, 2015). We agree with the

District Court. The record supports the court's conclusion that the legitimate services

Rowland performed for Apple were inseparably intertwined with the services he

performed for Wilson-Foley's campaign, and that Rowland would not have performed

services for Apple at all but for his planned cover-up. Because the District Court's

factual finding regarding the nature of the payments to Apple is not "clear error,"

*Cramer*, 777 F.3d at 601, the six-level sentencing enhancement was proper and the

sentence need not be disturbed.

**CONCLUSION**

Rowland's remaining argument, regarding the constitutionality of limits on

individual campaign contributions, is foreclosed by the Supreme Court's decision in

30

*Buckley v. Valeo*, 424 U.S. 1 (1976).  Accordingly, for the foregoing reasons, we **AFFIRM** the judgment of the District Court.