15-94(L)
United States v. Natal

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2016

(Argued: November 22, 2016     Decided: February 23, 2017)

Docket Nos. 15-94, 15-1012, 15-1020

_____

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

HECTOR NATAL a/k/a BOOM BOOM, HECTOR MORALES

*Defendants-Appellants.*

_____

B e f o r e:

KATZMANN, *Chief Judge*, WINTER, *Circuit Judge*, and STEIN, *District Judge*.[*]

_____

_____

[*] Judge Sidney H. Stein of the United States District Court for the Southern District of New York, sitting by designation.

Defendants Hector Natal and Hector Morales appeal from their judgments of conviction and their sentences, imposed by the United States District Court for the District of Connecticut (Arterton, *J.*). Following a joint jury trial, Natal was convicted of crimes including arson resulting in death, and Morales was convicted of crimes including accessory after the fact to arson, and destruction and concealment of evidence. The district court sentenced, in principal part, Natal to life imprisonment and Morales to 174 months' imprisonment, and the defendants appealed. This opinion addresses the following issues. First, we hold that testimony concerning how cell phone towers operate must be presented by an expert witness, but that the admission in the instant case of lay opinion testimony on this subject was harmless. Second, we hold that Morales's conviction for destruction and concealment of evidence must be vacated in light of the intervening Supreme Court case *Yates v. United States*, 135 S. Ct. 1074 (2015), and that Morales is entitled to *de novo* resentencing. Third, we direct the district court, at Morales's resentencing, to group Morales's three counts of conviction for accessory after the fact pursuant to U.S.S.G. § 3D1.2. Therefore, we **REMAND** Morales's case to the district court with instruction to vacate Morales's count of conviction for destruction and concealment of evidence and to conduct *de novo* resentencing of Morales. In all other respects, we **AFFIRM** the judgment of the district court.

———————————

MICHAEL J. GUSTAFSON (Sandra S. Glover, *on the brief*), Assistant United States Attorneys, *for* Deirdre M. Daly, United States Attorney, District of Connecticut, New Haven, CT.

JESSE M. SIEGEL, Law Office of Jesse M. Siegel, New York, NY, *for* Hector Natal.

HARRY SANDICK (George LoBiondo and Patricia S. Kim, *on the brief*), Patterson Belknap Webb & Tyler LLP, New York, NY, *for* Hector Morales.

———————————

PER CURIAM:

In this appeal of judgments of conviction and sentence involving crimes that include arson resulting in death, accessory after the fact to arson, and destruction and concealment of evidence, we write to address three issues: (1) Whether testimony on how cell phone towers operate must be provided by an expert witness rather than a lay witness; (2) Whether defendant Morales's conviction for destruction and concealment of evidence for re-painting his van must be vacated in light of the Supreme Court's holding in an intervening decision, *Yates v. United States*, 135 S. Ct. 1074 (2015), that the statutory provision under which Morales was convicted covers "only objects one can use to record or preserve information"; and (3) Whether, in calculating Morales's Sentencing Guidelines range, Morales's convictions for accessory after the fact must be "grouped" pursuant to U.S.S.G. § 3D1.2.

The essential factual background of this case is as follows:

3

On the early morning of March 9, 2011, three members of the Roberson family – Jaquetta[1] Roberson, Quayshawn Roberson, and Wanda Roberson – died in an intentionally-caused fire at 48-50 Wolcott Street in New Haven, Connecticut. Hector Natal, a neighbor of the Robersons, was charged with arson resulting in death, and his father, Hector Morales, was charged with being an accessory after the fact to arson for conduct that allegedly included driving Natal away from the scene of the fire after Natal started the blaze. Both Natal and Morales were charged with conspiring to tamper with, and tampering with, witnesses during law enforcement's investigation of the arson, including by seeking to cause witnesses to testify falsely to the grand jury. Additionally, Morales was charged with destruction and concealment of evidence for re-painting the van that he had allegedly used to drive Natal away from the fire. Natal was also charged with attempted arson for trying to start a fire at the same

---

[1] This spelling of Jaquetta Roberson's name appears in the indictment, although her name is spelled slightly differently in the government's appellate brief.

New Haven building in approximately October 2010.[2] Finally, both Natal and

Morales were charged with participation in a drug conspiracy.[3]

Defendants Natal and Morales were tried jointly in the United States

District Court for the District of Connecticut (Arterton, *J.*), and on April 18, 2013,

a jury found the defendants guilty on all counts. On January 8, 2015, the district

court sentenced Morales to 174 months' imprisonment and 36 months of

supervised release. On February 25, 2015, the district court sentenced Natal to

life imprisonment on the arson counts, 240 months on each of the other charges

that went to trial, and 40 years on the conviction resulting from Natal's guilty

plea to the cocaine possession charge, all to run concurrently. Following the

district court's entry of judgment, both Natal and Morales timely appealed.

On appeal, the defendants raise numerous claims, including allegations

that Natal's Confrontation Clause rights were violated at trial, that there was a

---

[2] Unless otherwise indicated, all references to "the fire" or "the arson" refer to the fire started in the early morning of March 9, 2011.

[3] Natal was initially indicted on June 23, 2011 on drug-related charges, and on October 4, 2011, he pled guilty to Count Two of that indictment. Count Two charged Natal with

prejudicial variance between the indictment and the proof at trial, that the district court erroneously admitted lay opinion testimony concerning the operation of cell phone towers, that Morales's conviction for destruction and concealment of evidence must be vacated in light of an intervening Supreme Court decision, that Natal's sentence was imposed in contravention of the Eighth Amendment, and that the district court's calculation of Morales's U.S. Sentencing Guidelines range was procedurally erroneous. In a case with many issues, the district court was thorough and meticulous.

We affirm the district court except as to the following claims. First, we hold that testimony on how cell phone towers operate constitutes expert testimony and may not be introduced through a lay witness. However, the admission in the instant case of lay opinion testimony on the operation of cell phone towers was harmless. Second, we hold that Morales's conviction for destruction and concealment of evidence must be vacated in light of the Supreme Court's decision in *Yates v. United States*, 135 S. Ct. 1074 (2015), handed down

possession with the intent to distribute 28 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

shortly after Morales filed the instant appeal. We remand Morales's case to the district court to vacate Morales's conviction for destruction and concealment of evidence, and, pursuant to *United States v. Powers*, 842 F.3d 177 (2d Cir. 2016), to conduct *de novo* resentencing of Morales. Third, as part of the district court's calculation of Morales's Guidelines range at the resentencing, Morales's three counts of conviction for accessory after the fact should be grouped pursuant to U.S.S.G. § 3D1.2. We reject the defendants' other claims. Consequently, we uphold all counts of conviction except Morales's conviction for destruction and concealment of evidence, and we remand Morales's case to the district court to vacate Morales's conviction for destruction and concealment of evidence and to resentence Morales *de novo*.

## I.     The admission of lay opinion testimony on how cell phone towers operate

Morales and Natal argue that the district court erred in admitting lay opinion testimony on the operation of cell phone towers instead of requiring this testimony to be presented by an expert witness. We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Rosemond*, 841 F.3d

95, 107 (2d Cir. 2016). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence or rendered a decision that cannot be located within the range of permissible decisions." *United States v. Rowland*, 826 F.3d 100, 114 (2d Cir. 2016) (quoting *United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014)). However, "[w]e will reverse only if an error affects a 'substantial right,' meaning that the error 'had a substantial and injurious effect or influence on the jury's verdict.'" *Id.* (first quoting Fed. R. Evid. 103(a); then quoting *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (internal quotation marks omitted)). "[W]here a court, upon review of the entire record, is sure that the evidentiary error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* (quoting *Garcia*, 413 F.3d at 210) (alteration in original).

"Historical cell-site analysis," as the Seventh Circuit recently explained, "uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time." *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016). A cell phone connects to a cell phone tower in order to access the cellular network and communicate with other phones. *Id.*

8

"Each cell tower covers a certain geographic area[,]" which "depends upon 'the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade).'" *Id.* (quoting Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J. L. & TECH. 3, 5 (2011)). "While the proximity of the user is a significant factor in determining the cell tower with which the cell phone connects," other factors also play a role, including structural features of the tower and the phone, as well as the geography and topography of the surrounding environment. *Id.* at 295-96; *see also* Matthew Tart et al., *Historic Cell Site Analysis – Overview of Principles and Survey Methodologies*, 8 DIGITAL INVESTIGATION 185, 186-87 (2012).

Here, Natal and Morales attempted to show at trial that Michael Shamash, the landlord of the New Haven building burned in the arson, was a plausible alternative suspect in the arson. To counter this theory, the government sought to introduce evidence that Shamash's cell phone was connecting to cell phone towers in Queens, New York, on the night of the fire. In particular, the government called Joseph Trawicki, an employee of the Sprint Nextel wireless

9

communications company, to testify regarding Shamash's cell phone activity. The district court permitted Trawicki to testify as a Sprint records custodian in order to explain records showing "what law enforcement relied on in ruling out Shamash" as a suspect in the arson, and admitted Shamash's cell phone records as business records pursuant to Federal Rule of Evidence 803(6). The government did not seek to show that Trawicki's testimony satisfied the requirements for admissible expert testimony under Federal Rule of Evidence 702, and the district court, over the defendants' objection, did not require the government to make this showing.

Trawicki, on the witness stand, explained entries on the Sprint phone records containing details about the calls in which Shamash's phone had participated on the night of the fire (for example, the time and duration of each call), as well as the location of the cell phone towers to which Shamash's cell phone had connected at the beginning and end of each call. When asked about the factors that would make a phone call "start with one cell tower and end with another cell [tower]," Trawicki responded:

> Your handset is always looking for the strongest available signal, and your handset makes that determination, not the network, not anything else. And your handset, the instant it sees another strong signal that's stronger than the one it has, it will jump to that signal. That could be movement, it could be radio frequency interference, it could be just a tower that had a better signal that was previously busy becomes available. Based on this information, it's impossible – just looking at these individual records, it's impossible to say if there's movement there or not. . . . It's just your line of site [sic] to the tower, any radio frequency interference, like that.

Trawicki also indicated that a cell phone will connect to the tower with the "strongest available signal," which may not be the closest tower. Trawicki ended his testimony by stating that a certain cell phone number, which was elsewhere identified as belonging to Shamash, connected to a tower in Queens at 1:41 a.m. on the day of the fire. The arson was alleged to have occurred at approximately 1:15 a.m. in New Haven.[4]

In addition to admitting Trawicki's testimony as lay testimony, the district court permitted the government to offer lay testimony from two law enforcement

---

[4] The defense did not cross-examine Trawicki because, according to defense counsel, the defendants had not realized before trial that the government was planning to call a witness to discuss cell phone tower location data. The government, defense counsel argued, had violated a pretrial understanding that no evidence on cell phone towers

officers, who testified that Shamash had been eliminated as a suspect in the arson investigation partially because Shamash's cell phone was shown by his cell phone records to be in Queens at the time of the fire. One of these law enforcement officers stated, for example, that Shamash's "cell phone . . . was down at [Shamash's] house bouncing off a cell phone tower."

On summation, the government drew the following conclusions from the cell phone tower evidence:

> Before we move off the arson, I want to talk briefly about the landlord, the notion the landlord did it, Michael Shamash. Well, we know he was in Queens the night of the fire. And I've got these phone records here, which we can zoom in on. . . . And then we know from the representative from Sprint how cell phones work – cell towers, and I'll direct your attention over to these columns. You get the repoll number and the cell tower number, and you go to another document at the back of the exhibit and you are going to see that the towers that Mr. Shamash was hitting off at the time, around 1:52 and 2:04 a.m., they all come back to 64th Street, Flushing, New York. So, I don't think there is any dispute that Mr. Shamash was not in New Haven standing outside the door saying should I light it, or words to that effect.

---

would be offered. *See infra* for the Court's conclusion that these claims by the defendants do not warrant a finding of reversible error.

12

On appeal, the defendants argue that the district court erred in admitting testimony on cell phone towers, especially the testimony offered by Trawicki, from a lay witness. Federal Rule of Evidence 701 provides that

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Federal Rule of Evidence 702, in turn, contains standards for the admission of expert testimony. *See* Fed. R. Evid. 702. "Lay opinion under Rule 701 must be limited to opinions that 'result[] from a process of reasoning familiar in everyday life.'" *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend.). "[T]he purpose of Rule 701(c) is 'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend.).

The Second Circuit has not yet ruled on whether testimony concerning cell phone towers requires expertise. We hereby join the Seventh and Tenth Circuits in holding that testimony on how cell phone towers operate must be offered by an expert witness. *See Hill*, 818 F.3d at 296 ("[The witness's] testimony . . . included statements about how cell phone towers operate. In our view, this fits easily into the category of expert testimony, such that Rule 702 governs its admission."); *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) ("The agent's testimony concerning how cell phone towers operate constituted expert testimony because it involved specialized knowledge not readily accessible to any ordinary person."); *see also United States v. Reynolds*, 626 Fed. App'x 610, 614 (6th Cir. 2015). We need not hold that *all* evidence related to cell phone towers necessarily requires expertise. But we caution that the line between testimony on how cell phone towers operate, which must be offered by an expert witness, and any other testimony on cell phone towers, will frequently be difficult to draw,

and so both litigants and district courts would be well advised to consider seriously the potential need for expert testimony.[5]

In the instant case, Sprint employee Trawicki offered testimony on how cell phone towers operate when he indicated, for example, that a cell phone will connect to the tower with the strongest available signal, which may not be the closest tower; that factors such as radio interference, tower availability, and the line of sight between a phone and a tower affect the tower to which a cell phone connects; and that the phone handset determines which signal is strongest. At least these aspects of Trawicki's testimony did not "'result[] from a process of reasoning familiar in everyday life.'" *Cuti*, 720 F.3d at 459 (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend.). They were, instead, "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Therefore, the government in the instant case introduced testimony that required expertise through a lay witness.

_____

[5] In this case, asking the jury to draw the conclusion that Shamash could not have been in New Haven because his cell phone was using a tower in Queens required testimony on the possible ranges of any relevant cell phone towers and how they operate, which required expertise.

15

However, the admission here of lay opinion testimony on how cell phone towers operate was harmless and not reversible error. "The principal factors" in the harmless error "inquiry are 'the importance of the witness's wrongly admitted testimony' and 'the overall strength of the prosecution's case.'" *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2002) (quoting *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)). Here, the government's case against the defendants' theory that Shamash had committed the arson was not based solely on evidence concerning Shamash's cell phone; an FBI agent testified at trial that Shamash was ruled out as a suspect partly on the basis of witness accounts that Shamash was in New York on the night of the fire, and a New Haven police officer testified that Shamash was ruled out partly because, in law enforcement's view, Shamash had no financial motive to set the fire.

More significantly, the prosecution presented a very strong case against the defendants. Government witnesses testified that Natal admitted to them that he started the fire, including in a tape-recorded conversation that was played for the jury. One of these witnesses testified that Morales told her that he had driven Natal away from the fire. A neighbor of Natal and Morales testified that she saw

16

the defendants driving away from 48-50 Wolcott Street in Morales's van on the night of the fire. The same neighbor also described previous confrontations between Natal and residents of 48-50 Wolcott Street. The government also presented substantial evidence of attempts by Natal and Morales to thwart the police's investigation into the crime, including by instructing family members to testify falsely to the grand jury and by painting Morales's van a different color after eyewitness reports surfaced of a blue van leaving the scene of the fire.

Natal and Morales, for their part, offered evidence in opposition to the government's case. For example, they highlighted government witnesses' prior inconsistent statements, and called their own witnesses, some of whom gave unfavorable testimony about Shamash. Nevertheless, "upon review of the entire record," the Court can be "sure that the evidentiary error did not influence the jury, or had but very slight effect." *Rowland*, 826 F.3d at 114 (quoting *Garcia*, 413 F.3d at 210). Therefore, we find that the admission of lay opinion testimony on how cell phone towers operate was harmless and not reversible error.

Relatedly, Natal and Morales argue that the government violated Federal Rule of Criminal Procedure 16 by not disclosing before trial its intent to offer

17

expert testimony, and that the district court abused its discretion in not granting the defendants a continuance that defense counsel sought in order to retain an expert to assist defense counsel in cross-examining Trawicki. In light of our holding that testimony concerning how cell phone towers operate constitutes expert testimony, we also hold that such testimony is covered by the disclosure requirements of Federal Rule of Criminal Procedure 16. However, any error related to Federal Rule of Criminal Procedure 16 or the denial of a continuance was harmless for the reasons specified above.

## II. Morales's conviction for destruction and concealment of evidence

Morales argues, and the government concedes, that Morales's conviction for destruction and concealment of evidence must be vacated in light of the Supreme Court's decision in *Yates v. United States*, 135 S. Ct. 1074 (2015), which issued after Morales filed his notice of appeal. Morales painted his blue van with black primer after the fire, and the government alleged that Morales took this action out of a concern that a blue van had been seen leaving the scene of the fire. Accordingly, Morales was charged, in Count Eleven of the indictment, with "knowingly alter[ing] a tangible object, that is, a blue 1994 Dodge Caravan, with

18

the intent to impede . . . an investigation" in violation of 18 U.S.C. § 1519. The jury convicted Morales on this count.

The Supreme Court held in *Yates*, however, that a "tangible object" within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. § 1519, covers "only objects one can use to record or preserve information, not all objects in the physical world." *Yates*, 135 S. Ct. at 1081. Because Morales's van was not an "object[] one can use to record or preserve information," *id.*, Morales's act of repainting his van is not covered by 18 U.S.C. § 1519. Indeed, the dissenting opinion in *Yates*, specifically referencing the instant case, stated that Morales's alleged act of "repainting [his] van to cover up evidence of [a] fatal arson" would, in light of the *Yates* Court's holding, "now fall outside § 1519." *Id.* at 1100 (Kagan, J., dissenting). The plurality opinion in *Yates* also referred to *United States v. Morales* and did not dispute the dissent's statement that Morales's conduct would not be covered by 18 U.S.C. § 1519. *See id.* at 1088 n.8.

Therefore, the Court hereby remands Morales's case to the district court to vacate Morales's conviction for destruction and concealment of evidence (Count Eleven). Further, this Court has recently confirmed that when a count of

19

conviction is overturned due to a "conviction error," the proper remedy is *de novo* resentencing, except in circumstances not applicable here. *Powers*, 842 F.3d at 179-81; *see also United States v. Rigas*, 583 F.3d 108, 117 (2d Cir. 2009). Consequently, on remand, Morales must be resentenced *de novo*.

## III.    The calculation of Morales's Sentencing Guidelines range

Morales contends that his sentence was procedurally unreasonable because the district court should have grouped his three counts of conviction for accessory after the fact in calculating his Guidelines range. To elaborate, Morales was charged with three counts of being an accessory after the fact to arson. Each count referred to one of the three arson counts charged against Natal, one for each of the three victims of the arson. The district court at Morales's sentencing, over Morales's objection, declined to "group" Morales's three counts of conviction for accessory after the fact to arson. As a result, the district court applied the multiple count analysis in U.S.S.G. § 3D1.4 ("Determining the Combined Offense Level") without grouping the accessory counts. Morales notes that if the accessory counts had been grouped, Morales's Guidelines range would

20

have been 121-151 months' imprisonment, not 168-210 months' imprisonment. The district court sentenced Morales to 174 months' imprisonment.

"A district court commits procedural error where it . . . makes a mistake in its Guidelines calculation. . . ." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). "Procedural reasonableness is reviewed for abuse of discretion," *United States v. Desnoyers*, 708 F.3d 378, 385 (2d Cir. 2013), but "[t]he district court's interpretation and application of the Sentencing Guidelines is a question of law, which we review *de novo*," *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016).

We hold that Morales's counts of conviction for accessory after the fact to arson must be grouped pursuant to U.S.S.G. § 3D1.2. This provision, titled "Groups of Closely Related Counts," states that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction. . . ." U.S.S.G. § 3D1.2. Additionally, the application notes to this provision of the Guidelines state that "[a]mbiguities should be resolved in accordance with the

21

purpose of this section as stated in the lead paragraph, i.e., to identify and group 'counts involving substantially the same harm.'" U.S.S.G. § 3D1.2 cmt. n.2 (quoting U.S.S.G. § 3D1.2).

Here, Morales was convicted not of the substantive crime of arson, but of the "distinct" offense of accessory after the fact, which "is differently punished." *Bollenbach v. United States*, 326 U.S. 607, 611 (1946); *see also United States v. Cabrales*, 524 U.S. 1, 7 (1998); *United States v. James*, 998 F.2d 74, 80 (2d Cir. 1993). In particular, Morales's "offense is . . . that of interfering with the processes of justice." Wayne R. LaFave, 2 *Subst. Crim. L.* § 13.6 (2d ed.); *see also United States v. Vidal*, 504 F.3d 1072, 1078 (9th Cir. 2007) ("Accessory-after-the-fact liability . . . is aimed at post-offense conduct that aids the offender in evading law enforcement."), *abrogated on other grounds*, *see Cardozo-Arias v. Holder*, 495 Fed. App'x 790, 792 n.1 (9th Cir. 2012).

As the Supreme Court of Minnesota stated, in interpreting Minnesota's criminal statutes, "accomplices after-the-fact come along after the victims have been harmed and do not further their victimization merely by helping the principal offenders evade the law." *State v. Skipintheday*, 717 N.W.2d 423, 427

22

(Minn. 2006). Consequently, the Minnesota Supreme Court indicated, the defendant's "three counts of being an accomplice after-the-fact, all arising from a single behavioral incident, were not multiple-victim crimes, and [we]re therefore not subject to multiple sentences." *Id.* at 427. Similarly, Morales's counts of conviction for accessory after the fact "involv[ed] substantially the same harm" under U.S.S.G. § 3D1.2, namely damage to the "administration of justice." *Id.* at 425. The "victim" for the purpose of U.S.S.G. § 3D1.2 is hence "the societal interest that is harmed," that is, society's interest in the administration of justice, and "the societal interests that are harmed" by the conduct giving rise to Morales's three convictions for accessory after the fact "are closely related." U.S.S.G. § 3D1.2 cmt. n.2. Therefore, these counts should "be grouped together into a single Group." U.S.S.G. § 3D1.2. We accordingly direct the district court, in calculating Morales's Guidelines range at his resentencing, to group his three counts of conviction for accessory after the fact pursuant to U.S.S.G. § 3D1.2.

## CONCLUSION

We have considered the other claims raised by defendants Natal and Morales, and we find them to be without merit. Accordingly, we **AFFIRM** the

23

judgment of the district court except as to Morales's conviction for destruction and concealment of evidence. We **REMAND** Morales's case to the district court to vacate his conviction for destruction and concealment of evidence, and to conduct *de novo* resentencing of Morales. We also direct the district court, at Morales's resentencing, to group Morales's counts of conviction for accessory after the fact pursuant to U.S.S.G. § 3D1.2.